**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHAILE STEINBERG, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>CEB INC., THOMAS L. MONAHAN , III, GREGOR S. BAILAR, STEPHEN M. CARTER, GORDON J. COBURN, KATHLEEN A. CORBET, L. KEVIN COX, DANIEL O. LEEMON, STACEY S. RAUCH, JEFFREY R. TARR, GARTNER, INC., and COBRA ACQUISITION CORP.,<br><br>　　　　　　Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

## **COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### **NATURE OF THE ACTION**

1.　　This action stems from a proposed transaction announced on January 5, 2017 (the "Proposed Transaction"), pursuant to which CEB Inc. ("CEB" or the "Company") will be acquired by Gartner, Inc. ("Parent") and Cobra Acquisition Corp. ("Merger Sub," and together with Parent, "Gartner").

2.　　On January 5, 2017, CEB's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, shareholders of CEB will receive $54.00 in cash and 0.2284 shares of Gartner common stock for each share of CEB common

stock. Following the close of the Proposed Transaction, CEB stockholders will only own 9% of the combined company.

3. On February 6, 2017, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of CEB common stock.

9. Defendant CEB is a Delaware corporation and maintains its principal executive office at 1919 North Lynn Street, Arlington, Virginia 22209. CEB's common stock is traded on the NYSE under the ticker symbol "CEB."

10. Defendant Thomas L. Monahan, III ("Monahan") is a director, Chairman of the Board, and Chief Executive Officer ("CEO") of CEB.

11. Defendant Gregor S. Bailar ("Bailar") is a director of CEB. According to the Company's website, Bailar is Chair of the Audit Committee.

12. Defendant Stephen M. Carter ("Carter") is a director of CEB. According to the Company's website, Carter is a member of the Audit Committee and Chair of the Compensation Committee.

13. Defendant Gordon J. Coburn ("Coburn") is a director of CEB. According to the Company's website, Coburn is a member of the Audit Committee and Chair of the Nominating and Corporate Governance Committee.

14. Defendant Kathleen A. Corbet ("Corbet") is a director of CEB. According to the Company's website, Corbet is a member of the Audit Committee.

15. Defendant L. Kevin Cox ("Cox") is a director of CEB. According to the Company's website, Cox is a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

16. Defendant Daniel O. Leemon ("Leemon") is a director of CEB. According to the Company's website, Leemon is a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

17. Defendant Stacey S. Rauch ("Rauch") is a director of CEB. According to the Company's website, Rauch is a member of the Audit Committee.

18. Defendant Jeffrey R. Tarr ("Tarr") is a director of CEB. According to the Company's website, Tarr is a member of the Audit Committee.

19. The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20. Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

21. Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

22. Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of CEB (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23. This action is properly maintainable as a class action.

24. The Class is so numerous that joinder of all members is impracticable. As of October 28, 2016, there were approximately 32,228,207 shares of CEB common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

26. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the

Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company*

29. CEB is a best practice insight and technology company. In partnership with leading organizations around the world, the Company develops innovative solutions to drive corporate performance.

30. CEB equips leaders at more than 10,000 companies with the intelligence to effectively manage talent, customers, and operations.

31. The Company is a trusted partner to nearly 90% of the Fortune 500 and FTSE 100, 80% of the JSE, and more than 70% of the Dow Jones Asian Titans.

32. On July 26, 2016, CEB issued a press release wherein it reported its financial results for the second quarter ended June 30, 2016. The Company reported revenue of $242.6 million, an increase of 4.6%; adjusted revenue of $251.1 million, an increase of 7.9%; and

adjusted EBITDA of $64.5 million, an increase of 6.9%.

33. CEB also reported that it completed its acquisition of Evanta Ventures, Inc. and an affiliated business (collectively, "Evanta"). Portland, Oregon-based Evanta fosters collaboration and the exchange of best practices between Information Technology & Security, Human Resources, and Finance leaders through nearly 200 annual events, online and offline learning platforms, and subscription information offerings.

34. With respect to the results, Individual Defendant Monahan, CEB's Chairman and CEO, commented:

> Our focus in the second quarter remained squarely on delivering great customer impact and setting up for stronger outcomes in the second half and beyond. Current events in the economy and society create an unusual opportunity for us to help our clients and members, and we are working hard to deliver impact[.] You can see the result in this quarter: organic bookings growth improved modestly to the low single-digits, our CEB Events group came out of the gates quickly following the Evanta acquisition, and we delivered solid results in quarterly revenue and Adjusted EBITDA. We enter the third quarter with a great team on the field and our eyes on sharp execution amid the continued volatility of the current environment.

35. On October 25, 2016, CEB issued a press release wherein it reported its financial results for the quarter ended September 30, 2016. The Company reported that, for its CEB Segment, for the nine months ended September 30, 2016, adjusted revenue increased 4.6% compared to the nine months ended September 30, 2015. Additionally, for the Company's CEB Talent Assessment Segment, for the three months ended September 30, 2016, adjusted EBITDA increased 24.7% compared to the three months ended September 30, 2015.

36. With respect to the results, Individual Defendant Monahan commented:

> We continue to see strength in our efforts to launch new talent management products, drive global growth, expand our footprint in the middle market, and rapidly integrate and scale the Evanta platform. We also see very promising momentum in our newly integrated account management structures in Sales and Service and Talent Management. Our key area of focus is now sustaining our

highest levels of operational intensity throughout Q4, particularly in North America large corporate, and delivering strong performance and profitability in 2017.

*The Preclusive Merger Agreement*

37.     On January 5, 2017, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

38.     Despite a limited and inadequate "go shop" period, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.03(a) of the Merger Agreement states, in relevant part:

> (a) After the end of the Transaction Solicitation Period, except, in each case, with respect to an Excluded Party, the Company shall not, nor shall it authorize or instruct any of its Subsidiaries or any of its and their respective directors, officers or employees or any of their respective investment bankers, accountants, attorneys or other advisors, agents or representatives (collectively, "Representatives") to, (i) directly or indirectly solicit or initiate, or knowingly encourage, induce or facilitate any Takeover Proposal or any inquiry or proposal that may reasonably be expected to lead to a Takeover Proposal or (ii) directly or indirectly participate in any discussions or negotiations with any Person regarding, or knowingly furnish to any Person any non-public or confidential information with respect to any Takeover Proposal or any inquiry or proposal that may reasonably be expected to lead to a Takeover Proposal. The Company shall, and shall cause its Subsidiaries and its and their respective Representatives to, except, in each case, with respect to an Excluded Party, immediately cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Takeover Proposal, or any inquiry or proposal that may reasonably be expected to lead to a Takeover Proposal, request the prompt return or destruction of all confidential information previously furnished and immediately terminate all physical and electronic data room access previously granted to any such Person or its Representatives.

39. Further, the Company must promptly advise Gartner of any proposals or inquiries received from other parties. Section 5.03(c) of the Merger Agreement states:

> (c) In addition to the obligations of the Company set forth in paragraphs (a) and (b) of this Section 5.03, following the end of the Transaction Solicitation Period the Company shall promptly, and in any event within 48 hours of the receipt thereof, advise Parent in writing of any Takeover Proposal, the material terms and conditions of any such Takeover Proposal (including any changes thereto) and the identity of the person making any such Takeover Proposal. The Company shall (x) keep Parent informed in all material respects and on a reasonably current basis of the status and details (including any change to the terms thereof) of any Takeover Proposal, and (y) provide to Parent as soon as practicable after receipt or delivery thereof copies of all correspondence and other written material exchanged between the Company or any of the Company Subsidiaries and any Person that describes any of the terms or conditions of any Takeover Proposal.

40. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Gartner a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.03(b) of the Merger Agreement provides, in relevant part:

> (b) Except as set forth below, neither the Company Board nor any committee thereof shall (i) (A) withdraw (or modify in any manner adverse to Parent), or propose publicly to withdraw (or modify in any manner adverse to Parent), the approval, recommendation or declaration of advisability by the Company Board or any committee thereof with respect to this Agreement or (B) approve, recommend or declare advisable, or propose publicly to approve, recommend or declare advisable, any Takeover Proposal (any action in this clause (i) being referred to as an "Adverse Recommendation Change") or (ii) approve, recommend or declare advisable, or propose publicly to approve, recommend or declare advisable, or allow the Company or any of its Subsidiaries to execute or enter into, any Alternative Acquisition Agreement. Notwithstanding the foregoing, at any time prior to obtaining the Company Stockholder Approval:
>
> (ii) if the Company has received a bona fide written Takeover Proposal that the Company Board has concluded in good faith (after consultation with the Company's outside counsel and financial advisor) is a Superior Proposal, then the Company Board may (A) effect an Adverse Recommendation Change with respect to such Superior Proposal or (B) authorize the Company to terminate this Agreement pursuant to Section 8.01(f) to enter into an Alternative Acquisition

8

Agreement with respect to such Superior Proposal, in each case if and only if:

(A) the Company Board determines in good faith (after consultation with the Company's outside counsel and financial advisor) that the failure to do so would be inconsistent with its fiduciary duties pursuant to applicable Law;

(B) the Company has complied with its obligations in all material respects pursuant to this Section 5.03 with respect to such Takeover Proposal; and

C) (i) the Company has provided prior written notice to Parent at least three (3) Business Days in advance (the "Notice Period") to the effect that the Company Board has (A) received a bona fide written Takeover Proposal that has not been withdrawn; (B) concluded in good faith that such Takeover Proposal constitutes a Superior Proposal; and (C) resolved to effect an Adverse Recommendation Change or to terminate this Agreement pursuant to this Section 5.03, which notice will describe the basis for such Adverse Recommendation Change or termination, including the identity of the Person or "group" of Persons making such Takeover Proposal, the material terms of such Takeover Proposal and copies of all relevant documents relating to such Takeover Proposal; and (ii) prior to effecting such Adverse Recommendation Change or termination, the Company and its Representatives, during the Notice Period, have negotiated with Parent and its Representatives in good faith (to the extent that Parent has requested to so negotiate) to make such adjustments to the terms and conditions of this Agreement so that such Takeover Proposal would cease to constitute a Superior Proposal; it being understood that (a) in the event of any material revisions to such Takeover Proposal, the Company will be required to deliver a new written notice to Parent and to comply with the requirements of this Section 5.03 with respect to such new written notice, except that with respect to a Takeover Proposal made by an Excluded Party, references to three (3) Business Days in this Section 5.03(b) shall be deemed to be two (2) Business Days from and after the second time such a notice is given and (b) the Company Board, at the end of the Notice Period (after consultation with the Company's outside counsel and financial advisor), must have in good faith reaffirmed its determination that such bona fide written Takeover Proposal is a Superior Proposal.

41. Further locking up control of the Company in favor of Gartner, the Merger Agreement provides for a "termination fee" of up to $99 million, payable by the Company to Gartner if the Individual Defendants cause the Company to terminate the Merger Agreement.

42. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful

competing offers for the Company.

*Inadequate Merger Consideration and Interests of the Company's Officers and Directors*

43. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate. Based on the closing price of Gartner common stock on January 3, 2017, the merger consideration is valued at $76.81 per share.

44. The intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

45. Additionally, the financial analyses performed by the Company's own financial advisor, Centerview Partners LLC ("Centerview"), confirm the inadequacy of the merger consideration. For example, Centerview's *Discounted Cash Flow Analysis* yielded implied values per share of CEB common stock as high as $86.65.

46. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

47. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

48. For example, as a result of the Proposed Transaction, Individual Defendant Monahan stands to receive $4,709,195, and the Company's four other named executive officers stand to receive $12,349,502.

49. Additionally, Gartner "may enter into definitive agreements regarding employment or retention for certain of CEB's employees," and "Gartner has agreed to assume employment, change in control or severance agreements with CEB's current executive officers."

*The Registration Statement Omits Material Information, Rendering It False and Misleading*

50. Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

51. The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.

52. First, the Registration Statement omits material information regarding the Company's financial projections, Gartner's financial projections, and the financial analyses performed by Centerview in support of its so-called fairness opinion.

53. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

54. With respect to CEB's financial projections, the Registration Statement fails to disclose: (i) the definition of unlevered free cash flow and all constituent line items used in the calculation of unlevered free cash flow; (ii) stock-based compensation expense; (iii) interest; (iv) taxes; (v) depreciation and amortization; (vi) net non-operating foreign currency gain (loss); (vii) debt modification costs; (viii) CEO non-competition obligation; (ix) gain (loss) on other investments; (x) equity method investment gain (loss); (xi) restructuring costs; (xii) impairment costs; (xiii) gain on cost method investment; (xiv) business transformation cost; (xv) restructuring; (xvi) acquisition and integration related costs; (xvii) goodwill impairment loss;

(xviii) the impact of Deferred Revenue fair value adjustment; (xix) a reconciliation of all non-GAAP to GAAP metrics; (xx) the historical growth case; and (xxi) the recent growth case.

55. With respect to Centerview's *Discounted Cash Flow Analysis* for CEB, the Registration Statement fails to disclose: (i) the inputs and assumptions used to determine the discount rate range of 9.50% to 13.50%; and (ii) the range of estimated terminal values of CEB.

56. With respect to Centerview's *Discounted Cash Flow Analysis* for Gartner, the Registration Statement fails to disclose: (i) the definition of unlevered free cash flow and all constituent line items used in the calculation of unlevered free cash flow; (ii) the range of estimated terminal values of Gartner; and (iii) the inputs and assumptions used to determine the discount rate range of 7.50% to 10.50%.

57. The Registration Statement also fails to disclose the CEB-Prepared Gartner Forecasts and Gartner's own internal financial projections, which are particularly material here, as a significant portion of the merger consideration is Gartner stock.

58. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; (ii) "CEB's Reasons for the Merger and Recommendation of the CEB Board of Directors"; (iii) "Opinion of Centerview Partners LLC"; and (iv) "CEB Certain Unaudited Financial Forecasts."

59. Second, the Registration Statement omits material information regarding Allen & Company LLC ("Allen"), CEB's second financial advisor in connection with the Proposed Transaction.

60. Specifically, the Registration Statement fails to disclose any information regarding Allen's engagement, including the fee to be received by Allen, the percentage of the

fee that is contingent upon consummation of the Proposed Transaction, and the services Allen has provided to CEB, Gartner, and/or their affiliates in the past two years and the amount of compensation received for such services.

61. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

62. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; and (ii) "CEB's Reasons for the Merger and Recommendation of the CEB Board of Directors."

63. Third, the Registration Statement omits material information regarding the background of the Proposed Transaction. The Company's stockholders are entitled to an accurate description of the "process" the directors used in coming to their decision to support the Proposed Transaction.

64. For example, the Registration Statement fails to disclose which "certain CEB employees" Gartner proposed to enter into employment agreements with as a "closing condition" in Gartner's December 16, 2016 draft merger agreement.

65. The Registration Statement fails to disclose the timing and nature of any communications regarding future employment and/or directorship of CEB's officers and directors, including who participated in all such communications.

66. The Registration Statement fails to disclose the nature of the "inquiries from several private equity firms about CEB's potential interest in a strategic transaction" received by

Individual Defendant Monahan after August 31, 2016, as well as Monahan's basis for informing such parties that CEB "was not seeking offers."

67. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; (ii) "CEB's Reasons for the Merger and Recommendation of the CEB Board of Directors"; and (iii) "Interests of CEB Directors and Executive Officers in the Merger."

68. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to CEB's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and CEB

69. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

70. The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. CEB is liable as the issuer of these statements.

71. The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

72. The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

73.  The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

74.  The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

75.  By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

76.  Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Gartner

77.  Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

78.  The Individual Defendants and Gartner acted as controlling persons of CEB within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of CEB and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

79.  Each of the Individual Defendants and Gartner was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading

15

prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

80. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Registration Statement.

81. Gartner also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

82. By virtue of the foregoing, the Individual Defendants and Gartner violated Section 20(a) of the 1934 Act.

83. As set forth above, the Individual Defendants and Gartner had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.  In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.  Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.  Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.  Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 3, 2017                                **RIGRODSKY & LONG, P.A.**

By: */s/ Brian D. Long*
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Gina M. Serra (#5387)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

*Attorneys for Plaintiff*